IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARK A. CANDLER,                                        No. C 13-05325 CW

       Petitioner,                                      ORDER DENYING
                                                       PETITION FOR WRIT
    v.                                                 OF HABEAS CORPUS

AMY MILLER, Warden,

       Respondent.

_____/

     Petitioner Mark A. Candler, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction. He asserts claims for ineffective assistance of counsel based on appellate counsel's failure to challenge on appeal (1) the sufficiency of the evidence to support his conviction for attempted murder; and (2) the trial court's denial of the motion to suppress evidence gathered by wiretap. Respondent has filed an answer and a memorandum of points and authorities in support thereof and Petitioner has filed a traverse. Petitioner moves for an evidentiary hearing. For the reasons discussed below, the Court DENIES the motion for an evidentiary hearing and DENIES the petition.

BACKGROUND

I.   Procedural History

     On August 5, 2010, an Alameda County jury found Petitioner guilty of one count of attempted murder, one count of shooting at an inhabited dwelling, three counts of being a felon in possession of a firearm, and one count of possession of an assault weapon. Each charge was accompanied by an allegation that Petitioner

committed it in association with a criminal street gang.  These
enhancement allegations were also found to be true.  On October
29, 2010, the trial court sentenced Petitioner to forty-eight
years to life.  Represented by counsel, Petitioner filed a direct
appeal to the California Court of Appeal, raising six grounds:
(1) that the admission of a large volume of evidence related to
gangs was inflammatory and unfairly prejudicial; (2) that the
trial court wrongly allowed the State's gang expert to opine that
he shot the victim; (3) insufficiency of the evidence with respect
to the felon in possession counts; (4) sentencing error with
respect to the felon in possession counts; and (5) erroneous
denial of the motion to sever his trial from his co-defendants.
On May 22, 2012, the Court of Appeal affirmed, except as to the
claim of sentencing error.  On August 22, 2012, the California
Supreme Court denied Petitioner's petition for review of the
denial of his direct appeal.

On September 20, 2012, Petitioner, proceeding <u>pro se</u>, filed a
state habeas petition raising three grounds for relief:
(1) ineffective assistance of appellate counsel; (2) violation of
his Fifth and Fourteenth Amendment rights based on the
misapplication of case law regarding the suppression of wiretap
evidence; and (3) insufficiency of the evidence based on reliance
on unsworn, out-of-court statements.  The California Supreme Court
denied the petition on December 12, 2012.

On September 13, 2013, Petitioner filed a second habeas
petition in the California Court of Appeal, raising the same
grounds as those contained in his September 20, 2012 petition "for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the purpose of federalizing all claims."  The California Court of Appeal denied the petition on October 4, 2013.

Petitioner filed the instant habeas petition on November 15, 2013.

II.  Statement of Facts

A.   The 2006 shooting

According to trial testimony, gangs from the Acorn and Ghost Town neighborhoods in West Oakland had a strong alliance in the period leading up to June 30, 2006.  On June 30, 2006, a funeral took place on Filbert Street for a Ghost Town resident named Sean. At the end of the funeral, Aaron Burrell and Marquis Burton got into a dispute after Burrell accused Burton of stealing his car. Although Mr. Burrell was a Ghost Town resident and Burton was an Acorn resident, they were close and Burrell referred to Burton as his god-brother.  When Mr. Burrell threatened to fight Burton, another Acorn resident, Wendell Stevenson, threatened to fight back against him.  Another Ghost Town resident, Jermel Holloway, threatened to join the fight on Mr. Burrell's side.  Mr. Stevenson and Mr. Holloway were members of the Acorn and Ghost Town gangs, respectively.

After the funeral, mourners gathered on Martin Luther King (MLK) Way near 31st Street, in Ghost Town, for a candlelight vigil.  Close to fifty people were there.  Among them were Joy-Nequia Brooks, Dashawna Ross, Mr. Burrell and Mr. Holloway.  At approximately 4:50 PM, nearby police officers heard more than thirty gunshots in rapid succession.  One officer, Ouseng Saepern, saw a white Dodge Magnum leaving the scene and driving very fast. Officer Saepern followed the Magnum but lost sight of the vehicle

within a few blocks.  Shortly thereafter, another officer, Anthony
Tedesco, arrived at the intersection of 31st Street and MLK. He
saw many people looking south on MLK and testified that he began
collecting shell casings because they were in a busy intersection.
He recovered thirty-two 7.62 caliber casings associated with
automatic assault rifles and eight .40 caliber casings from a
handgun.  Later analysis showed that the casings came from an SKS-
type rifle, an AK-type rifle and a handgun.  Residents of several
nearby homes testified that they heard gun fire and found bullet
holes in their homes.  Mr. Holloway was shot three times in the
buttocks and legs during the incident.  He was not interviewed by
the police at the time of the shooting.  No one at the scene was
willing to talk to the police officers.

B.   The witnesses

Two years later, Sergeant Tony Jones was investigating a
separate March 31, 2008 murder of Kevin McKenzie, a Ghost Town
resident.  Sergeant Jones learned that Mr. Burrell had been
sitting in the driver's seat of the car that Mr. McKenzie was next
to when he was shot.  Accordingly, Sergeant Jones requested that
Mr. Burrell be brought to the station for questioning.  Sergeant
Jones testified that Mr. Burrell told him that he believed the
person who killed Mr. McKenzie intended to shoot Mr. Burrell.

Based on this information Sergeant Jones asked Mr. Burrell to
explain the history of the conflict between the Acorn and Ghost
Town gangs.  Mr. Burrell relayed the story of the June 2006
funeral dispute and the shooting that took place later that
afternoon.  Based on the information gathered from Mr. Burrell,
Sergeant Jones also questioned Joy-Nequia Brooks, Dashawna Ross

and Jermel Holloway.  Petitioner and Elijah Thomas were then charged with the 2006 shooting.  Each of the 2008 statements and the witnesses' trial testimony are summarized below.

### 1.  Petitioner

At trial, Petitioner testified that, on the day of the 2006 shooting, he received a phone call regarding the altercation between Mr. Stevenson and Mr. Holloway outside the funeral home on Filbert Street.  Petitioner further testified that he went to see Stevenson to find out what happened.  Mr. Stevenson told Petitioner about the gathering at MLK and 31st but said he did not want to go there because he heard Mr. Holloway was high. Petitioner testified that he went to the vigil both to try to talk to Mr. Holloway and to pay his respects.  Petitioner drove to the vigil in a red two-tone Buick and looked for Mr. Holloway.  When he arrived he saw about sixty people at the intersection.  He located Mr. Holloway and began walking towards him and calling his name from about twelve feet away.  Petitioner saw Mr. Holloway "whip out" but testified that he could not tell at first "if it was a fake gun or some type of joke." RT 2356-57.[1]  Petitioner testified that he could see Mr. Holloway pointing at him with whatever was in his hand and he heard gun shots.  Once he heard the gun shots, Petitioner began running toward his car.  As he ran, Petitioner heard automatic gunfire coming from a different direction.

---

[1] In this Order, RT stands for Reporter's Transcript; CT for Clerk's Transcript; RAT for Reporter's Augmented Transcript, and CST for Clerk's Supplemental Transcript.

United States District Court
For the Northern District of California

Petitioner testified that he fell to the ground and began crawling toward his car when he heard the automatic gunfire. At some point, he looked up and saw Mr. Stevenson standing near a white Dodge Magnum, firing an automatic rifle into the air. After shooting two bursts of gunfire, Mr. Stevenson got into his white Dodge Magnum and drove south on MLK. Petitioner testified that he saw Mr. Holloway run into the intersection of 31st Street and MLK and then get into the backseat of a different white Dodge Magnum that also drove south on MLK. After approximately a minute, Petitioner got in his car and drove to Kaiser Hospital in Oakland to pick up his son's mother from work.

2.   Jermel Holloway

Mr. Holloway, the victim of the 2006 shooting, was killed in a separate incident in November 2009 and, hence, was not available to testify at trial. At the 2008 preliminary hearing, while he discussed the injuries he sustained as a result of the 2006 shooting, he denied that either Petitioner or his co-defendant, Elijah Thomas, shot him in 2006. He stated that he and the mother of his child were present at the funeral, but denied that there had been any argument. He stated that he heard shots, realized he was hit, and then ran into a nearby store. He further stated that a stranger drove him to the hospital.

Prior to the preliminary hearing, Mr. Holloway, incarcerated in prison, had spoken to Sergeant Jones. He had refused to allow the conversation to be recorded, but Sergeant Jones took notes and testified as to their conversation. Sergeant Jones testified that Mr. Holloway told him that, prior to the shooting, the Ghost Town and Acorn gangs got along. He told him that the argument at the

6

United States District Court
For the Northern District of California

funeral was a result of Mr. Burton taking Mr. Burrell's car.  He said that he then got involved in the argument, and told Mr. Stevenson that if he fought Mr. Burton, then he would fight Mr. Stevenson.  Mr. Stevenson then drove away, saying that he was not interested in fighting.  Mr. Holloway told Sergeant Jones that he had a feeling the Ghost Town gang members were going to come back and retaliate.

Sergeant Jones testified that Mr. Holloway told him that on the day of the 2006 shooting, he saw Petitioner and Mr. Thomas drive from 31st Street and get out of a white Dodge Magnum with a "long chopper."  RT 2063.  Sergeant Jones testified that a "chopper" is common street terminology for an assault rifle.  RT 2078.  Next, he heard shots being fired behind him and got hit in the back of the legs.  He went on to tell Sergeant Jones that he turned around and saw Petitioner shooting at him.

### 3.   Joy-Nequia Brooks

At trial, Joy-Nequia Brooks testified that she was present at MLK and 31st Street at the time of the 2006 shooting.  She testified that she froze for five to ten seconds and then started running, so she did not see who was shooting.  At trial, Ms. Brooks further testified that she had never seen Petitioner or Mr. Thomas before.

In Ms. Brooks's 2008 statement, she admitted to knowing Petitioner as a member of the Acorn gang, knowing his real name and having seen him often.  Ms. Brooks stated that the argument between Mr. Burrell, Mr. Holloway, Mr. Burton and Mr. Stevenson could have turned into a fight, "but they wanted to go get guns and they came back with guns . . . "  CST 2498.  She stated that

**United States District Court**
For the Northern District of California

as she stood on the corner of 31st Street and MLK, she saw
Petitioner and Mr. Thomas drive up in a Jaguar to the middle of
the block on MLK between 31st and 32nd Streets.  She stated that
she saw Mr. Thomas stop the car in the middle of the block,
Petitioner exit the passenger side, shoot Mr. Holloway, get back
in the car and leave.  She stated that Petitioner used a "big ass
gun . . . that was like a[n] army gun."  CST 2503.  She stated
that Mr. Stevenson also drove up in a red "scraper car."  CST
2499.  Ms. Brooks stated that Mr. Stevenson got out of his car,
but Ms. Brooks did not see him shoot at anybody.  Ms. Brooks also
observed a third car drive up at the same time, but she could not
remember what kind of car it was.

        3.   Aaron Burrell

After invoking his Fifth Amendment rights at trial, Mr.
Burrell was granted immunity as to any testimony given.  RT 533.

At trial, Mr. Burrell testified that prior to the 2006
shooting, there were no problems between the Acorn and Ghost Town
gangs.  A month or two prior to the 2006 shooting, Mr. Burrell's
car, a Buick with chrome rims, was stolen.  After the car was
stolen, Mr. Burrell saw parts of what he believed to be his car,
specifically his rims, in other cars in the Acorn neighborhood.
Mr. Burrell was affiliated with the Ghost Town neighborhood.  He
testified that he believed his god-brother, subsequently
identified as Marquis Burton, also known as "Flip," had the car
because Mr. Burton had a master key used by car thieves to steal
cars.  RT 826.

Mr. Burrell testified that, on the day of the 2006 shooting,
he and his cousin, Dashawna Ross, were at the funeral for Sean, a

United States District Court
For the Northern District of California

Ghost Town resident.  He stated that, after the funeral, he saw
Mr. Burton and they began to argue about Mr. Burrell's stolen car.
Mr. Burrell stated that Mr. Holloway was with him and that Mr.
Stevenson, also known as "Weezy," came to Mr. Burton's defense.
During the argument, after Mr. Burrell indicated that he wanted to
fight Mr. Burton, Mr. Stevenson said that if Mr. Burrell fought
Mr. Burton, then Mr. Stevenson would fight Mr. Burrell.  Mr.
Holloway jumped in, saying that if Mr. Stevenson fought Mr.
Burrell, then Mr. Holloway would fight Mr. Stevenson.  Mr. Burrell
stated that after this exchange, Mr. Stevenson and Mr. Burton
drove off together, while he and Mr. Holloway drove off together.

Mr. Burrell testified that, after the funeral, a group of
people gathered at 31st and MLK, which was in the Acorn
neighborhood.  He arrived at the intersection in a car with Mr.
Holloway.  Then Mr. Holloway parked the car and Mr. Burrell got
high by smoking marijuana and drinking "syrup," a form of
Robitussin with codeine.  RT 842.

Mr. Burrell testified that, right before the shooting began,
he noticed several cars, including a white car, but did not see
any people coming out of the cars.  Mr. Burrell stated that he was
sitting in his friend's car (which was the same car in which he
and Mr. Holloway left Sean's funeral) when the shots were fired
from behind where he was parked.  As the shots were being fired,
he ran on foot to the backyard of a home and, when the shooting
stopped, he got back into the car.  He testified that he did not
see who was doing the shooting or who was shot.  He further
testified that he, his friend, and two other people drove away to

East Oakland.  Mr. Burrell stated that, later that day, he saw Mr. Holloway.

At trial, after Mr. Burrell testified as described above, the prosecutor played a recording of a conversation between Mr. Burrell and Sergeant Jones made after the 2008 shooting that left Mr. Burrell's friend, Mr. McKenzie, dead.  Mr. Burrell testified that whatever he said that was recorded during that conversation, he was telling Sergeant Jones "whatever he wanted to hear to get out of there."  RT 864.  The prosecutor presented a diagram of the area, a diagram to which Mr. Burrell and Sergeant Jones refer in the recording.  Mr. Burrell told Sergeant Jones that he was "by the dead end" of 31st Street during the shooting, looking towards 32nd Street.  CST 2517.  He stated that he saw Petitioner get out of a white Dodge Magnum and that he saw Mr. Thomas get out of a blue BMW SUV.  He then told Sergeant Jones that Mr. Thomas was the first to start shooting.  He told Sergeant Jones, "They start shooting.  M-A[2] had bounced out.  He had shot, but he was shooting -- he shot hella houses and sh-t."  RT 882.  He also told Sergeant Jones that Petitioner had an assault rifle that he used to do the shooting.  In the recording, Mr. Burrell is heard picking Petitioner out of a photo array.

> 4.  Dashawna Ross (testifying as Raylon Bell)

At trial, Ms. Bell testified that she did not know Petitioner.  She testified that on the day of the shooting, she went looking for her son at a funeral being held at Baker's Funeral Home on Filbert Street in the Acorn neighborhood.  She

---

[2] "M-A" or "M-A-C" are Petitioner's street names.

stated that she did not find her son in the crowd, so she left the area after five or ten minutes.  Next, she went to 32nd and MLK, again looking for her son.  Ms. Bell testified that she double-parked her car, because there were no parking spots, and looked for her son in the crowd.  She went on to testify that she did not know about Mr. Burrell's stolen car nor did she see Petitioner outside of the funeral home on the date of the shooting.  She stated that she did not see a shooting.

In her 2008 statement to Sergeant Jones, Ms. Bell stated that she knew Petitioner from having seen him around the neighborhood, and that they had had a two and a half hour conversation at a birthday party.  She stated that the car which started the argument at the funeral was stolen from in front of her home.  She was at the funeral that day, and had seen and heard the argument over the car.  After the funeral, Ms. Bell, accompanied by two other people, including Ms. Brooks, drove from Ghost Town to 31st Street and MLK in the Acorn neighborhood.  She told Sergeant Jones that, between two and three o'clock in the afternoon that day, she saw Petitioner and Mr. Thomas driving down the street.  Someone yelled that the men were coming, and then "MAC . . . jumped out, started shooting."  CST 2536.  She also told Sergeant Jones that Petitioner had "a chopper, . . . a hundred rounder or something," CST 2537, and that even though she was on the ground, she could see Petitioner shooting as she looked under a car.

C.   The wiretap

On April 22, 2008, the Oakland Police Department (OPD) obtained a warrant authorizing a wiretap on three phone numbers associated with members of the Acorn gang.  The order was issued

upon an application by the Alameda County District Attorney, an approval by the OPD Chief Wayne Tucker, and an affidavit by OPD Officer Steve Valle.  The operation focused on three individuals named in the application, as well as other "Target Subjects," including Petitioner.  The individuals were targeted because OPD believed that they were involved in crimes associated with a street gang.  The wiretap was authorized for thirty days.

After the initial wiretap was authorized, Officer Valle submitted a new affidavit supporting a request to modify the original wiretap to include an authorization to tap Petitioner's cellphone, the number of which OPD had recently discovered. Neither the District Attorney nor the Chief of Police signed the modification request.  On May 5, 2008, Alameda County Superior Court Judge Jon Rolefson executed a modified order authorizing the tapping of Petitioner's phone.  The order acknowledged the previous application by the District Attorney, and the approval by Chief Tucker.

A few weeks later, the District Attorney submitted an application requesting a thirty day extension of the modified wiretap, supported by Officer Valle's affidavit and OPD Assistant Chief Howard Jordan's approval on behalf of Chief Tucker.  On May 20, 2008, Judge Rolefson authorized an extension of the wiretap operation for an additional thirty days.  The extension order acknowledged the past approval of Chief Tucker.  The evidence gained from the wiretap was used to establish the 2008 firearms charges against Petitioner and Mr. Thomas.

**United States District Court**
For the Northern District of California

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, that is, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409. Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). In the present case, the highest court to issue a reasoned decision on Petitioner's first claim is the California Court of Appeal, while the highest court to state a reasoned decision on his second claim is the Superior Court of Alameda County. If no state court has adjudicated a federal claim on the merits, the federal court must review the claim de novo. Cone v. Bell, 556 U.S. 449, 472 (2009); see also Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (holding that de novo standard of review rather than the deferential standard of § 2254(d) applies where state courts never reached merits of habeas claim). As discussed below, there is no reasoned state court decision for Petitioner's first claim; hence, the Court reviews that claim de novo.

DISCUSSION

Petitioner claims that he was denied the effective assistance of counsel on appeal because appellate counsel did not challenge (1) the sufficiency of the evidence with respect to the attempted murder charge or (2) the admission of the wiretap evidence.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are also reviewed according to the standard set out in Strickland v. Washington, 466 U.S. 668 (1984). Smith v. Robbins, 528 U.S. 259, 285 (2000). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a meritorious issue. Id. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. Id. Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason — because he declined to raise a weak issue. Id.

**United States District Court**
For the Northern District of California

I.   First Ground for Relief: Sufficiency of the evidence to
     support the attempted murder conviction

Petitioner argues that appellate counsel was deficient
because he failed to challenge the sufficiency of the evidence to
support the attempted murder charge.  Specifically, Petitioner
argues that the evidence presented that he shot at Mr. Holloway
came through four unsworn, out-of-court statements that were later
recanted.

The Due Process Clause "protects the accused against
conviction except upon proof beyond a reasonable doubt of every
fact necessary to constitute the crime with which he is charged."
In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who
alleges that the evidence in support of his state conviction
cannot be fairly characterized as sufficient to have led a
rational trier of fact to find guilt beyond a reasonable doubt
states a constitutional claim, which, if proven, entitles him to
federal habeas relief.  Jackson v. Virginia, 443 U.S. 307, 321,
324 (1979).

A federal court reviewing collaterally a state court
conviction does not determine whether it is satisfied that the
evidence established guilt beyond a reasonable doubt.  Payne v.
Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal
habeas court in general question a jury's credibility
determinations, which are entitled to near-total deference.
Jackson, 443 U.S. at 326.  If confronted by a record that supports
conflicting inferences, a federal habeas court "must presume —
even if it does not affirmatively appear in the record — that the
trier of fact resolved any such conflicts in favor of the

prosecution, and must defer to that resolution." Id.  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  Jackson, 443 U.S. at 324.  The Supreme Court has recently emphasized that "Jackson claims face a high bar in federal habeas proceedings. . . ."  Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam).

After AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable."  Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011).

Petitioner's claim that the evidence presented at trial was insufficient to support an attempted murder conviction is premised on the prosecution's reliance on four out-of-court witness statements, all of which were later recanted at trial.  Petitioner argues that these statements were the "only evidence produced at trial," they were not reliable or substantial, and thus fail the substantial evidence test.

"A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record

United States District Court
For the Northern District of California

contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied." People v. Barnwell, 41 Cal. 4th 1038, 1052 (2007); see also People v. Banks, 59 Cal. 4th 1113, 1156 (2014) ("In reviewing a challenge to the sufficiency of the evidence, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt"). Accordingly, to find that Petitioner's counsel was objectively unreasonable in failing to raise the sufficiency of evidence issue on appeal, Petitioner must show that the out-of-court statements at issue are not reasonable, credible evidence of solid value upon which a jury could find him guilty of attempted murder.

Both Petitioner and the State rely on People v. Cuevas, 12 Cal. 4th 252, 267 (1995), to support their arguments as to the sufficiency of the four out-of-court statements.  In Cuevas, the defendant was convicted of assault with a firearm based on the out-of-court identifications by two witnesses, both of whom recanted their testimony at trial.  Id.  The California Supreme Court held that the probative value of a subsequently recanted out-of-court identification depends on "many varied circumstances" including, "(1) the identifying witness's prior familiarity with the defendant; (2) the witness's opportunity to observe the perpetrator during the commission of the crime; (3) whether the witness has a motive to falsely implicate the defendant; and (4) the level of detail given by the witness in the out-of-court identification and any accompanying description of the crime."

Id.   Furthermore, the Supreme Court held that there was "no logic to requiring corroboration of out-of-court identifications, but not of other types of hearsay that might be offered as evidence of guilt."   Id. at 265.   It also agreed with other courts that "an out-of-court identification can be sufficient by itself to support a conviction even in the absence of other evidence connecting the defendant to the crime."   Id. at 266-67.   Thus, the Court held that out-of-court statements need not be corroborated to be considered sufficient evidence upon which to base a conviction.

After considering the Cuevas factors, this Court, in its de novo review, finds that the out-of-court statements had sufficient probative value to support the attempted murder conviction.

### 1.   Prior familiarity with Petitioner

Petitioner admits that "all four witnesses were familiar or very familiar" with him.   Traverse, 35.   In her 2008 statement to Sergeant Jones, Ms. Bell stated that she and Petitioner had a two and a half hour conversation at a recent birthday party.   Ms. Brooks admitted, in 2008, to knowing Petitioner, his gang affiliation, and his real name and to having seen him often.

### 2.   Opportunity to observe Petitioner during the crime

At trial, Mr. Burrell, Ms. Brooks and Ms. Bell denied seeing Petitioner at the scene of the crime.   However, in their 2008 pretrial statements, each placed Petitioner at the scene and stated they were in a position to see the crime as it was committed.   Ms. Bell stated that, even though she was on the ground when the shots were fired, from her spot under the car, she could see Petitioner shooting.   Ms. Brooks stated that she was near the shooting and described the gun Petitioner carried.   Mr.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Burrell stated that from his car, parked at the "dead end" of 31st Street, he saw Petitioner exit a white Dodge Magnum and start shooting.

        3.    Motive to falsely implicate Petitioner

Petitioner argues that because the witnesses are each affiliated with Ghost Town, they have a motive to lie about him, as a member of the rival Acorn gang.  Yet, this fact could also be interpreted against Petitioner.  It is unlikely that witnesses seeking to frame Petitioner would recant the very statements that implicate him in this crime.

        4.    Level of detail given by the witnesses and any accompanying description of the crime

Petitioner placed himself at the scene of the shooting, as did all of the witnesses in their out-of-court statements.  Ms. Brooks stated that she was privy to the argument at the funeral home, and gave a detailed description of the shooting, including seeing Petitioner with a gun, and a description of the gun Petitioner carried.  Ms. Bell gave a similar description of the gun, provided details about the car stolen from in front of her house and stated details about what was said during the shooting, what time it took place and identified Petitioner as a shooter. Mr. Burrell also gave details about Petitioner's car, the direction from which the cars came before the shooting, and corroborated Ms. Brooks's and Ms. Bell's statement about seeing Petitioner fire his gun and the type of gun Petitioner used in the shooting.  The statements about the type of gun used were corroborated by the assault-rifle-caliber bullet holes found in the surrounding houses.

United States District Court
For the Northern District of California

On balance, each of the Cuevas factors for evaluating out-of-court statements weighs heavily in favor of finding the out-of-court statements to be credible evidence of solid value.  All of the witnesses were familiar with Petitioner, making it likely that they would be able to identify him as the shooter.  They all admit to being present at the scene when the shooting took place and, by recanting, eliminate the suggestion that they were trying to implicate Petitioner falsely.  Lastly, all four witnesses provided detailed accounts of the shooting, and their stories corroborate each other.

Furthermore, in Cuevas, the California Supreme Court set out a number of factors for evaluating the significance of a failure to make an in-court identification:

> (1) whether the identifying witness admits, denies, or fails to remember making the out-of-court identification; (2) whether the witness remembers the underlying events of the crime but no longer believes in the accuracy of the out-of-court identification; (3) whether, if the witness claims the identification was false or erroneous, the witness offers an explanation for making a false or erroneous identification; [and] (4) whether, if the witness claims a failure of recollection, there are reasons supporting the loss of memory; (5) whether there is evidence that the witness's failure to confirm the identification in court resulted from the witness's appreciation that doing so would result in the defendant's conviction; or (6) whether there is evidence that . . . the witness's failure to confirm the identification arises from fear or intimidation.

12 Cal. 4th at 267-268.  The most relevant here is that of evidence that a witness's recantation is due to fear of retaliation.

In her 2008 statement to Sergeant Jones, Ms. Ross stated that she was afraid of retaliation and did not want to go to court because of events that occurred the last time she was in court.

21

She explained, "I done got threatened and chased down and people
want to kill me behind going to court." CST 2529.  Sergeant Jones
then asked Ms. Ross if the reason she did not want to testify was
that she was "afraid of something happening to" her.  Id.  She
replied, "Exactly.  Exactly." Id.  Accordingly, Ms. Ross's fear
of retaliation can explain why her trial testimony was different
from her statements to the police.  Likewise, Ms. Brooks stated in
her pretrial statement that after the 2006 shooting, she had
attempted to keep her distance from Petitioner, CST 2903, implying
that she was afraid of Petitioner.

Thus, for the reasons stated above, the Court finds that the
out-of-court statements made by the witnesses meet the substantial
evidence test, in spite of the subsequent recantations.  Hence,
appellate counsel could have reasonably concluded that, given that
the evidence was sufficient to support the conviction, there was
no merit to bringing a sufficiency of the evidence challenge on
appeal.

Furthermore, Petitioner has not shown, as required under
Strickland, "that the deficient performance prejudiced the
defense." Medley, 506 F.3d at 861.  The Ninth Circuit applies
Strickland to ineffective assistance of appellate counsel.  See
Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989) ("We review
claims of ineffective assistance of appellate counsel according to
the standard set out in Strickland v. Washington, 466 U.S. 668,
(1984)).  Under Strickland, a showing of prejudice means
Petitioner "must show that counsel's advice fell below an
objective standard of reasonableness, . . . and that there is a
reasonable probability that, but for counsel's unprofessional

United States District Court
For the Northern District of California

errors, [Petitioner] would have prevailed on appeal." <u>Miller</u>, 882 F.2d at 1434.

As discussed above, a challenge to the sufficiency of the evidence likely would not have succeeded.  Hence, even assuming his counsel's performance was unreasonable, Petitioner has not shown that he suffered prejudice.  Accordingly, Petitioner's request for habeas relief on this ground is DENIED.

II.  Second Ground for Relief: Motion to Suppress Wiretap Evidence

Petitioner next argues that appellate counsel was ineffective in failing to appeal the denial of his motion to suppress the wiretap evidence used to support his firearms convictions.[3]

The original wiretap authorization, signed by the District Attorney, the Chief of Police, and accompanied by an affidavit from Officer Valle, allowed for the monitoring of three target telephones.  For the modification, Officer Valle asked Judge Rolefson to add a fourth telephone line, specifically, that of Petitioner.  Chief Tucker was unavailable to sign the modified application and the District Attorney also did not sign.  In the

---

[3] Respondent argues that Petitioner's claim is unexhausted to the extent he argues that appellate counsel was ineffective in failing to raise a Fourth Amendment argument regarding the wiretap evidence.  However, Respondent also appears to acknowledge that Petitioner has exhausted both of his claims.  See Docket No. 15 at 19.  Even if Petitioner were making a Fourth Amendment claim, it would fail for the reasons discussed herein.  A habeas claim can be denied even if it is unexhausted.  <u>See</u> <u>Pimpton v. Carey</u>, 216 F. App'x 696, 697 (9th Cir. 2007) ("§ 2254(b)(2) permits denial of a federal habeas petition on the merits, notwithstanding the applicant's failure to exhaust, only where 'it is perfectly clear that the applicant does not raise even a colorable federal claim'") (quoting <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005)).

United States District Court
For the Northern District of California

place of the Police Chief, however, the Assistant Chief of Police, Howard Johnson, signed the application.

California law requires that "[e]ach application for an order authorizing the interception of a wire or electronic communication shall be made in writing upon the personal oath or affirmation of the Attorney General. . . or [of] a district attorney, or the person designated to act as district attorney in the district attorney's absence . . . to the presiding judge of the superior court or one other judge designated by the presiding judge." Cal. Penal Code § 629.50(a).

California courts look to federal as well as California law in applying the California wiretap statute. People v. Jackson, 129 Cal. App. 4th 129, 147 (2005). The Jackson court noted that the United States Supreme Court held that "exclusion of wiretap evidence is required under Title III only when there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." Id. at 149 (citing United States v. Giordano, 416 U.S. 505, 506 (1974)).

In Jackson, the California Court of Appeal explained the proper analysis of a motion to suppress wiretap evidence:

> (1) Has the defendant established a violation of a provision of the wiretap law? If not, the motion is denied. (2) If a wiretap violation has been established was the provision violated one which "was intended to play a central role in the statutory scheme[?]" If the provision was not intended to "play a central role," failing to comply with it will not render interceptions under the wiretap order unlawful and the motion is denied. (3) If the provision violated was central to the legislative scheme was the purpose of the provision

24

achieved in spite of the error?  If the purpose was achieved, the motion is denied.  If the purpose was not achieved, the motion is granted.

Id.  The Jackson court relied on federal law, the Ninth Circuit's opinion in United States v. Chun, 503 F.2d 533, 592 (9th Cir. 1974).  See Jackson, 129 Cal. App. 4th at 150 n.38 ("This test is drawn from United States v. Chun. . . .  The Chun test, or one substantially like it, has been followed in most other circuits").

Here, the Superior Court interpreted the facts surrounding this wiretap in the light of the California statute and Jackson. With regard to the first and second Jackson questions, the Superior Court stated,

> It's clear in reading the statute that the statute requires the authorization of the District Attorney and the head of the police agency for any order or modification.  I don't know how it could be any clearer.  So that's my view of the first question.  Second question is does that . . . authorization play a central role. . .  Chavez would suggest it does play a central role. . . . Even when we are talking about a modification, because that seems to me that the statute is contemplating, as I've already indicated in answer to the first question, that the request to modify these things, to the extent that they may include additional persons or additional numbers, should also be authorized by the enforcement officer, . . . in our case, the District Attorney and the chief of police.

RAT 38-40.

On the last Jackson question, however, the trial court stated,

> Was the purpose of the provision achieved in spite of the error.  And it seems to me in reading all of the documents that it was achieved.  And that was what was originally approved by Mr. Orloff [the District Attorney] and the chief of police was a request to allow the wiretap of three target telephones, 1, 2 and 3; however, what's clear from all the documents is the context of the investigation, the fact that additional phones were at that point, phone numbers not known, that from my reading of the documents, there was no greater target of the investigation than Mr. Candler, seems to me, have been the chief target of this investigation.  All the information before me in these dockets, what has alleged to have been Mr. Candler's role and the organization that he

25

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12

is alleged to have been the chief executive officer of, was the target of the investigation, and the purpose of the initial request or the limitation of the initial request for those first three phone numbers is because that's all that were known at the time.

It's clearly indicated from the documents that the officers did not know particular phone numbers associated with Mr. Candler.  They believe Mr. Candler changed his phone number quite often.  That was consistent with their experience in similar investigations.  Indeed, all the information that was obtained was in regard to target phone number, phone Number 4, was that it was only used by Mr. Candler and not indeed in his name.

So that also was, to my mind, consistent with the difficulty from the standpoint of the police at the time they presented these documents to Judge Rolefson and consistent with their representations about the difficulty of the investigation, the difficulty of finding out information what would be particular to Mr. Candler and while the requirement of the authorization of Mr. Orloff and the chief of police is both a statutory and seems to me to be one central to the statutory scheme, it seems to me that their review and their authorization of this investigation and its goals, which is what the point is, was accomplished.

13
14
15
16
17
18
19
20

Petitioner argues that the trial court misapplied the California wiretap statute and that appellate counsel was ineffective for not raising this issue on appeal.  To succeed on this claim, Petitioner must show that the appellate court, had this issue been raised, would have ruled in his favor and found that the purpose of the violated provision was not achieved due to the absence of key signatures on the wiretap modification application.  Jackson, 129 Cal. App. 4th at 149.

21
22
23
24

Petitioner relies on United States v. Giordano, 416 U.S. 505 (1974), and United States v. Chavez, 416 U.S. 562 (1974).  Petitioner's application of the principles discussed in both cases is misplaced.

25

In Giordano,

26
27
28

it developed at the hearings that the applications for interception authority presented to the District Court had inaccurately described the official who had authorized the applications and that neither the initial application for the

October 16 order nor the application for the November 6 extension order had been approved and authorized by Assistant Attorney General Will Wilson, as the applications had indicated.

416 U.S. at 509-510.  As a result, the Supreme Court ruled, "We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored."  Id. at 528.  In Giordano, however, "neither the initial application . . . nor the application for the . . . extension" contained the required signatures.  Here, the original wiretap was authorized and signed by both the District Attorney and the Chief of Police.

In Chavez, the Supreme Court held, "Under § 2515, suppression is not mandated for every violation of Title III, but only if 'disclosure' of the contents of intercepted communications, or derivative evidence, would be in violation of Title III."  416 U.S. at 574-575.  In Chavez, the Court declined to require suppression of wiretap evidence where the Assistant Attorney General was misidentified as giving authorization when "the Attorney General himself has actually given the approval."  416 U.S. at 569.  Here, the District Attorney and the Chief of Police authorized the initial wiretap.  The trial court also found that, at the time of the initial application, Petitioner was "the chief target of th[e] investigation."  Docket No. 1-1 at 24.

Thus, Petitioner has not satisfied his burden of showing that the trial court's admission of the wiretap evidence was such that the appellate court would likely have found that the trial court erred.

27

United States District Court
For the Northern District of California

1    Moreover, Petitioner has not shown, as required under

2   Strickland, "that the deficient performance prejudiced the

3   defense." Medley, 506 F.3d at 861.  As discussed above, even if

4   appellate counsel were to have raised this issue on appeal, the

5   appellate court could have reasonably agreed with the trial court.

6   Hence, Petitioner has not satisfied his burden that appellate

7   counsel unreasonably failed to bring a challenge on this ground.

8   Accordingly, Petitioner's request for habeas relief on this ground

9   is DENIED.

10  III. Evidentiary Hearing

11    A habeas petitioner is entitled to an evidentiary hearing on

12  disputed facts where his allegations, if proven, would entitle him

13  to relief.  Perez v. Rosario, 459 F.3d 943, 954 n.5 (9th Cir.

14  2006); Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995).

15  Petitioner is not entitled to an evidentiary hearing because he

16  has failed to present any allegations which, if proven, would

17  entitle him to relief.

18  IV.  Certificate of Appealability

19    The federal rules governing habeas cases brought by state

20  prisoners require a district court that denies a habeas petition

21  to grant or deny a certificate of appealability in the ruling.

22  Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

23    A petitioner may not appeal a final order in a federal habeas

24  corpus proceeding without first obtaining a certificate of

25  appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A

26  judge shall grant a certificate of appealability "only if the

27  applicant has made a substantial showing of the denial of a

28

constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists would not find its ruling on any of Petitioner's claims debatable or wrong. Therefore, a certificate of appealability is denied.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The request for an evidentiary hearing is denied.

2. The petition for a writ of habeas corpus is denied.

3. The Clerk of the Court shall enter a separate judgment, terminate all pending motions and close the file.

4. A certificate of appealability is denied.

IT IS SO ORDERED.

Dated: February 13, 2015

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California